UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | | |
|---|---|---|
| SHAROL MCDADE, | ) | |
| | ) | |
| Plaintiff, | ) | 3:09-CV-00225-LRH-VPC |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| NATIONAL AMERICAN INDIAN HOUSING COUNCIL, | ) | |
| | ) | |
| Defendant. | ) | |

Before the court is Defendant's Motion for Summary Judgment (#23[1]). Plaintiff filed an opposition (#26), and Defendant filed a reply (#32).

**I.   Facts and Procedural History**

This is a pregnancy discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(k). Beginning in 2001, Plaintiff Sharol McDade ("McDade") was employed by Defendant National American Indian Housing Council ("NAIHC") as a Technical Assistance/Training Specialist ("TATS"). McDade's position was in Reno, while NAIHC was headquartered in Washington, D.C. and had employees in various location across the country. Due to the loss of government funding and the resulting budgetary and solvency issues, in February 2007 NAIHC laid off 17 of its 33 employees, including 11 of the 13 TATS positions, one of which belonged to McDade.

---

[1] Refers to the court's docket entry number.

But while her TATS position was eliminated, McDade was retained with a change in position to Fundraising Development Coordinator. According to McDade, when Executive Director Paul Lumley ("Lumley") called McDade and informed her that she would be laid off, McDade informed Lumley that she had been preparing grant applications in addition to her TATS duties. Doc. #26, McDade Decl. at 2. Previously unaware of this, Lumley postponed McDade's layoff and called McDade again the following week to request that she take on fundraising duties. *Id.* Those duties had been performed out of the Washington, D.C. office by Communications Director Jane DeMarines, who was terminated around the same time. *Id.*; Doc. #23, Exh. Q. Lumley and McDade invented the title of McDade's new position, and she accepted the change in position with a reduction in salary but retention of vacation and health benefits. Doc. #26, McDade Decl. at 2. McDade assumed the new position on February 9, 2007. Doc. #23, Exh. B at 2.

NAIHC's funding issues did not abate, however, and a discussion and process of reorganization and the development of a new, diversified fundraising approach began at a Special Meeting of the Board of Directors on February 13, 2007. Doc. #23, Exh. B at 2-3; Exh. I at 2-3, 5. Regarding the reorganization, Lumley reported that even if NAIHC's funding were restored he was not interested in restoring staffing to the previous level and believed the organization "should be contracting services." Doc. #23, Exh. I at 5.

Two months later, at the 1st Quarterly Board of Directs Meeting held on April 17 and 18, 2007, Lumley addressed fundraising by advising the board that "implementing a diversified fundraising plan would require relocating the fundraising position back to Washington, DC." Doc. #23, Exh. J at 5 (minutes). Regarding the reorganization, Lumley again reported that due to "uncertain federal funding" acquiring a large TATS staff would be risky and "[c]ontracting the work" was the safer course. *Id.* at 8.

The following month, Lumley and McDade attended the NAIHC Annual Convention in Denver, Colorado. On May 20, the first day of the convention, McDade informed Lumley for the

1  first time that she was pregnant with twins and was due in November or December.  Doc. #26,

2  McDade Decl. at 3.  According to McDade, Lumley then asked, "Then why did you even bother to

3  come then?" in a "quick and hostile" manner.  *Id.*  After that, Lumley did not say anything else; he

4  "put his foot in his mouth."  Doc. #23, Exh. D at 86.  By contrast, Lumley's account is that

5  McDade informed him she had been ill because of her pregnancy, he congratulated her on her

6  pregnancy and told her if she was ill she could be excused from attending the convention, and she

7  declined his offer.  Doc. #23, Exh. B at 4.  McDade denies such a conversation took place.  Doc.

8  #23, Exh. D at 86; Doc. #26, McDade Decl. at 4.  It is undisputed they did not again discuss her

9  pregnancy in relation to her work.

10        On June 1, 2007, another Special Meeting of the Board of Directors was held, at which

11  Lumley again reported on the "Fundraising position relocation."  Doc. #23, Exh. K at 4 (minutes).

12  The minutes state, "As discussed at the previous Board meeting, the Fundraising/Coordinator

13  position will be relocated to Washington, DC.  There needs to be an increase of daily

14  communication with the DC staff, as well as meeting with potential sponsors and participating in

15  local fundraising events."  *Id.*

16        On June 21, 2007, Lumley formally informed McDade by phone that her position was

17  being relocated to the Washington, D.C. headquarters.  Lumley also sent a letter confirming their

18  conversation.  Doc. #23, Exh. L.  Lumley listed the strategic purposes of the relocation, requested

19  that McDade respond by July 6 as to whether she would relocate, and offered to discuss "alternate

20  forms of employment with NAIHC" if she declined.  *Id.*  McDade avers that until this time

21  relocation had not been mentioned to her.  Doc. #26, McDade Decl. at 5.

22        On July 5, McDade emailed Lumley asking when he anticipated her beginning work in the

23  D.C. office.  Doc. #23, Exh. N.  Lumley responded that he was "flexible" but "wanting a transition

24  in a 3 to 4 week timeframe."  *Id.*

25        On July 6, McDade sent a letter to Lumley declining to relocate and proposing alternatives.

26  Doc. #23, Exh. M.  McDade expressed her desire to continue as Fundraising Development

1 Coordinator but felt that she "may not have adequate time to prepare for the transition" to
2 Washington D.C. given that she had "several obligations" in Reno, her "family being the most
3 important." *Id.* McDade also wished to discuss other options. Acknowledging that continuing in
4 her current position "may not be a possibility," she asked if returning to her former TATS position
5 was a possibility. *Id.* McDade also expressed a desire to continue fundraising and proposed
6 splitting her time between the D.C. and Reno offices to accomplish the objectives outlined in
7 Lumley's June 21 letter. *Id.* She also stated, however, "I understand our budget may not allow
8 this," that she was "willing to do whatever it takes to continue to be a part of the NAIHC team as I
9 know this is a critical time in our existence," and that she was "willing to contribute to the NAIHC
10 team and sacrifice as necessary." *Id.*

11 Lumley and McDade had subsequent conversations regarding McDade's proposals, which
12 Lumley declined. Doc. #23, Exh. B at 14-15. Lumley informed McDade that NAIHC's budget
13 could not accommodate the travel and expenses associated with splitting time, nor could NAIHC
14 return her to her previously-eliminated TATS position because of its financial condition and
15 because it had determined to use contract employees instead of full-time, salaried TATS
16 employees. *Id.* Accordingly, Lumley offered McDade a TATS position as a contract employee,
17 without benefits. *Id.* at 15. Their conversations about these matters continued into August,
18 including a meeting at McDade's home on August 19. *Id.* Lumley reminded McDade that her
19 position was being relocated effective August 31 and asked if she had given further consideration
20 to working as a contract employee; however, McDade remained non-committal. *Id.*

21 On August 29, Lumley emailed a letter to McDade stating that her employment was
22 "terminated effective August 31, 2007," and that her benefits would continue through September
23 30, 2007, and could be continued through COBRA. Doc. 23, Exh. O. The letter also stated, "The
24 purpose for this termination is due entirely to a budget shortfall and is no reflection on work
25 performed." *Id.*

26 That same day, McDade filed a "Formal Complaint for Sexual Harassment" addressed to

4

NAIHC Chairman Marty Shuravloff. Doc. #26, Exh. 14. The complaint recounted McDade's version of the events leading to her termination and accused Lumley of pregnancy discrimination.

Several weeks later, at the 3rd Quarterly Board of Directors Meeting on September 18 and 19, 2007, Lumley reported that "[t]he function of the Fundraising Development position was moved to the Washington, DC office, but it has become evident that we do not have funds to fill the position." Doc. #23, Exh. H at 4 (minutes). Instead, Lumley himself began performing the fundraising duties as Executive Director and continued to do so until he resigned from NAIHC in 2009. Doc. #23, Exh. B at 3-4. Lumley's replacement, Mellor Willie, also continues to perform those duties. Doc. #23, Exh. A at 2. For that reason, McDade's former position has never been filled. *Id.*

McDade obtained a right to sue letter from the EEOC and initiated this action on April 28, 2009. Her complaint alleges a single claim against NAIHC for pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(k). Doc. #1. In November 2009, McDade filed an amended complaint; however, that filing was later stricken. Doc. ##17, 20. On April 16, 2010, NAIHC filed the instant motion for summary judgment. Doc. #23. McDade filed an opposition, Doc. #26, and NAIHC filed a reply, Doc. #32.

**II.    Legal Standard**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along

with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the plaintiff. *See id.* at 252.

### III.   Discussion

As amended by the Pregnancy Discrimination Act of 1978, Pub. L. 95-55, 92 Stat. 2076, Title VII of the Civil Rights Act of 1964 prohibits employer from discriminating in the terms, conditions, or privileges of employment on the basis of pregnancy. 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1); *see Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 670-71 (1983). As in other Title VII cases, pregnancy discrimination claims are analyzed under the three-step burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

First, the plaintiff has the burden of production to make out a prima facie case of discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*,

450 U.S. 248, 252-53 (1981). The plaintiff may establish this by showing (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003). Although the attributes qualifying the plaintiff for protected class status are often apparent and the employer's knowledge thereof is presumed, to establish a prima facie case of discrimination on the basis of pregnancy the plaintiff must also show that her employer knew she was pregnant when it committed the allegedly discriminatory act. *See LeFary v. Rogers Grp., Inc.*, 591 F.3d 903, 907-08 (7th Cir. 2010).

Second, if the plaintiff is successful, the burden of production shifts to the defendant to rebut the presumption of discrimination by producing evidence sufficient to raise a genuine issue of fact as to whether it had a "legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 255; *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005).

Third, if the defendant is successful, the *McDonnell Douglas* framework drops from the case, and the plaintiff bears the full and ultimate burden of persuading the factfinder that the employer intentionally discriminated against her. *Burdine*, 450 U.S. at 253; *Coghlan*, 413 F.3d at 1094. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 255. To prove that the defendant's proffered reason is a pretext for discrimination, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "[W]hen the plaintiff relies on circumstantial evidence [and produces no direct evidence of discrimination], that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Coghlan*, 413 F.3d at 1095 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

In seeking to establish a prima facie case of discrimination, McDade contends that (1) as a

7

pregnant woman she was a member of a protected class; (2) she was qualified for and satisfactorily performed her position; (3) she suffered an adverse employment action, in that she was forced to relocate or lose her position and was ultimately terminated; (4) following her termination, her position remained open, NAIHC had a continuing need for her skills and services, her duties were ultimately assumed by the Executive Director, and other field staff were neither forced to relocate nor forced to continue employment as contract employees without benefits; and (5) NAIHC knew she was pregnant when it informed her she was required to relocate and then terminated her employment. *See* Doc. #26, pp. 10-12.

NAIHC does not contest the first or third elements. Instead, NAIHC contends that McDade has failed to establish a prima facie case of discrimination because (1) McDade was no longer qualified for her position because she refused to relocate; (2) McDade has failed to establish that similarly situated employees were treated more favorably, as the other field staff she compares herself to were not similarly situated; and (3) NAIHC did not know of McDade's pregnancy at the time it decided to relocate her position. NAIHC further contends that its decision to relocate McDade's position to Washington, D.C. and her refusal to relocate constituted a legitimate, nondiscriminatory reason for her termination, and that McDade has failed to establish that the proffered reason was a pretext for discrimination.

The parties' arguments reflect a dispute as to whether NAIHC's decision to relocate McDade's position—which in this case was made prior to NAIHC's knowledge of McDade's pregnancy but was not disclosed and implemented until after NAIHC knew of her pregnancy—is properly taken into consideration at the first stage of the *McDonnell Douglas* analysis, or whether it is properly considered only as NAIHC's legitimate, nondiscriminatory reason at the second and third stages. The court need not resolve this philosophical dispute, however, as it is a distinction without a difference in this case. The *McDonnel Douglas* framework is merely a means to bring the litigants and the court to the ultimate question of whether the plaintiff can satisfy her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the

8

plaintiff." *Burdine*, 450 U.S. at 253. Indeed, at step three "the *McDonnell Douglas* framework drops out of the picture entirely." *Coghlan*, 413 F.3d at 1094. Thus, even assuming that McDade has stated a prima facie case, the determinative question is whether she has established a genuine dispute of material fact as to whether NAIHC had decided to relocate McDade's position to Washington, D.C. before it knew about her pregnancy, or whether the relocation was a pretext for discrimination. The court concludes that McDade has failed to do so.

As set forth above, NAIHC has submitted uncontroverted evidence (minutes of board meetings and Lumley's affidavit) that Lumley had decided to relocate the position of Fundraising Development Coordinator to Washington, D.C. as of April 17, 2007, before he was first told of McDade's pregnancy on May 20, 2007. While McDade makes a variety of arguments questioning the credibility and accuracy of the board minutes submitted by NAIHC, she fails to raise any grounds undermining the admissibility such evidence and fails to submit any evidence contradicting the contents of such evidence. Moreover, McDade fails entirely to controvert Lumley's sworn affidavit, which provides independent evidence that the decision to relocate McDade's position was made in April and subsequently carried out. *See* Doc. #23, Exh. B at 3. Thus, McDade has failed to raise a genuine issue of fact as to NAIHC's decision to relocate her position prior to its knowledge of her pregnancy.

Furthermore, McDade has failed to produce any direct evidence or specific and substantial circumstantial evidence that Lumley's implementation of that decision after he was informed of McDade's pregnancy was a pretext for discrimination. McDade argues that Lumley retained a less senior TATS employee while offering McDade only contract work without benefits. However, Lumley's inaction merely retained the status quo following the February 2007 TATS layoffs, during which Lumley had eliminated 11 of the 13 TATS positions, including McDade's, long before Lumley learned of McDade's pregnancy. If Lumley had not agreed to retain McDade as Fundraising Development Coordinator, McDade would have been terminated long before.

McDade also argues that Lumley's representation in her termination letter that "this

9

termination is due entirely to a budget shortfall and is no reflection on work performed" was not accurate because, "[c]ontrary to this assertion, Ms. McDade was terminated because of her decision not to relocate to DC." Doc. #26, p. 16.  But McDade fails to articulate how this line of argument establishes that NAIHC's ultimatum to relocate or be terminated was a pretext for discrimination.  Instead, the argument concedes that McDade was terminated because she refused to relocate.  Given that fact and the uncontroverted evidence that Lumley decided to relocate McDade's position for strategic reasons before he knew of her pregnancy, no reasonable jury could conclude that NAIHC intentionally discriminated against McDade on the basis of her pregnancy.

**IV.   Conclusion**

For the foregoing reasons, the court concludes that there is no genuine dispute of material fact in this case and that NAIHC is entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (#23) is hereby GRANTED.

IT IS SO ORDERED.  The Clerk of the Court shall enter judgment accordingly.

DATED this 13th day of March, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE